May it please the court. I'm Scott Stewart on behalf of the federal government. In this case the district court issued a class-wide preliminary injunction imposing on constitutional grounds extensive and burdensome procedures for challenging the arrest and detention of certain unaccompanied minors. That was error. Existing legal procedures fully satisfied. Could you please compare what the preliminary injunction required with what the TVP RRA and Flores required? Sure your honor. Among other things the injunction requires a very short timeline for the injunction. Seven days instead of a normal course immigration hearing which would become available on kind of normal course calendaring. And what's the normal course calendaring? I'm not sure it's surely longer your honor. What does the record show? I believe the record shows that it would take at least 7 to 14 days to make these happen. I don't believe the record has a whole lot of crystallization or clarity there. Let me try to refine this issue a little bit because I'm interested in what your response to Judge Baer's question is. You don't dispute that a class member, put aside whether a class should have been certified, is entitled to some sort of due process hearing after re-arrest to determine whether or not they really are now in the least restrictive environment. In other words, the Act says they should be kept in the least restrictive environment. The government has already made a determination as to these individuals that they're suitable for placement in a foster home if you will. And then the government says, oh no, you're no longer suitable for that placement because we now think you're a gang member. You do agree that at some point they have the right to some sort of hearing with respect to whether they're actually a gang member. We don't contest, Your Honor, that they are afforded a right to some kind of a hearing to test dangerousness. Right. To test that. And so your argument with the district court is that it requires the hearing too soon? It's kind of a number of things, Your Honor. I mean, that's a piece of it. I think to start with, I don't think the district court adequately accounts for the extensive procedures in place that do address this situation. So that's what I'm asking. Is your argument that due process procedures already in place suffice? Yes. Okay. So tell us what that's – now, I want to get back to Judge Baer's question. Tell us, without the district court's order, what would happen to one of these re-arrested upon allegations – re-detained, because they're always under some sort of, I suppose, detention, but put into a juvenile facility because you believe they're a gang member, how quickly and when could they contest that – that allegation? Sure, Your Honor. I guess here's the quick panoply of procedures. When these unaccompanied minors are taken back into custody, they're pretty quickly placed into HHS custody. HHS is then obliged to promptly place the child in the least restrictive setting that is in the best interest of the child to – to some extent. Sorry. No, we understand the statutory framework. I've just got – I'm trying to – maybe my question is not clear. All right. I think I was getting – Under the statutory framework, at some point, with respect to these class members, you went out and detained them and put them into a juvenile facility because you thought they were gang members. You agree, and don't contest today, that they have a due process right to a hearing, to have a determination made whether that's a correct – that that's a correct thing because otherwise – because otherwise, they're in a more restrictive environment than they're supposed to be in, and the Act gives them that – that – the Act says they should be in the least restrictive environment. I think I was getting right there, Your Honor. I don't mean to – Okay. So get right there. Tell me – tell me who they show up in front of and when, what neutral decision-maker they show up in front of and when to make this argument. So they – they get – they get notice of their right to contest the dangerousness finding. That is done before a neutral immigration judge. They get an appeal to the BIA. Wait. Okay. How quickly do they – how quickly will they have the ability to appear? See, the – what the – I'm reading – this is a preliminary injunction, obviously, and I'm reading the district court record, and the government says, well, it's a work in progress. We don't really know how quickly they'll show up in front of people. And the judge says, that's not good enough. Now, you can go back to the judge and say, we now have the work – we now have it worked out, and they can show up in front of an immigration judge in 7 to 14 days, as what you told Judge Bea. That may be perfectly sufficient, but that's not in the record in this case, is it? There – there was testimony that there could be – you know, argument, I guess I should say. I mean, again, this was highly truncated, so the record is a little compact on some of these issues, Your Honor. I don't think it very well crystallizes how long things would take. I think our submission is, you know, there's a normal course kind of – You see, we deal with normal course immigration hearings all the time, and they seem to take a long time. So that's why I'm trying to figure out where in this record there's something that will give me confidence that somebody who's detained will show up in front of an immigration judge in a week or two. Then it seems to me requiring 7 days or 10 days in a preliminary injunction might be an abusive discretion, but I'm trying to figure out where that is in this record. I'm not sure that I can push back on something in the record that they will – that will give you assurance, Your Honor, that they will end up in 7 to 14 days in front of an immigration judge. What I would emphasize, though, is that they do get a chance under the – under the existing procedures to challenge a dangerousness finding. And I'd emphasize that the context here is a little bit – it's a bit unusual because we are dealing with unaccompanied minors. So as Your Honor recognized earlier – And we're dealing with a statutory directive to keep them – so if these were adults, maybe you could just detain them all the time and no one would care, but we're dealing with a statutory directive here. Well, I think there's certainly stronger care concerns and sort of stewardship and custody issues, Your Honor. What I'd say to sort of close the loop on the procedural point, though, even though I can't give sort of a hard – a hard date on – on how quickly things will happen, is that under Flores and under the TVPRA, minors can challenge this determination. If they – if they make a showing that they're – that they're not presently dangerous, then they will be eligible for release. So in – if you're arrested in San Francisco, you get an arraignment within 48 hours, and one of the issues to go into is bail – 48 hours. Now, why shouldn't these unaccompanied children have a right to have their dangerousness determined within 48 hours of second detention? Your Honor, I give two reasons. The first – and I think this is something that I think got lost a little bit in the district court's opinion here, is that although the minors at issue in this case previously – previously had a suitability determination and a release determination made, often those happen years before. So somebody's been out for a while, they haven't come back into HHS custody, and very often – and there is discussion of this in our – in our excerpts of record, that what will happen is that after a suitability determination or release determination are made, somebody will make – a minor will make his or her way back into HHS custody, and in that time, circumstances have changed, some years have passed, the minors will have a different, you know, personal feature, they'll have – No, no, no, but no one doubts the government's ability upon obtaining information that the minor is dangerous to detain the minor, to take the minor out of the foster home and put the minor into a juvenile facility, and nobody doubts the government's ability to keep the juvenile there if, in fact, the juvenile's dangerous. That's not the question. The question is how quickly and before whom may the juvenile contest that governmental determination. And, sure, you get new information, but you – and, sure, maybe you made the decision years before, but the question is how do they get to contest it? Before an immigration judge and with an appeal to the BIA, Your Honor. And, again, timing issue is a challenge there, but they do get to contest that, and – Can I turn to the Flores hearing for a moment? Yes. That's a different kind of argument, isn't it? In other words, in Flores, the question is, upon initial detention, I think what the order says is you juveniles have a right to a prompt hearing to determine where they should be kept. Does the Flores consent decree really apply to the juvenile who's re-detained? Your Honor, I think in this case, I don't believe the issue has been joined. There are a couple footnotes in the district court's order where it sort of says, like, hey, there's no dispute in this – in the context between these parties that the – that the normal unaccompanied alien children rules kind of apply. So I don't think that's been put in issue, if I understand the question right. Assume that the Flores hearing is available. What's the record tell us about how quickly it would occur? I – beyond the mention of potentially being able to be done in a week or two, Your Honor, I don't think – I don't think it gives much more. Can you give us a record citation to the week or two? I'll try to – I'll try to track those. Take a note of that, because I think that's pretty important. Will do, Your Honor. I will. So other than a truncated period of time, from the government's point of view, what's wrong with the preliminary injunction? Sure, Your Honor. Among other things, it restricts – If it said a month, you have a month to do this. Right, Your Honor. Would that be okay? I think it would still be difficult, Your Honor. Just – I can't really commit without having a firm, you know, knowledge of how quickly some of these things are able to move. There just are a lot of challenges in the system. See, and by difficulty, and I think your response to Judge Hawkins' question focuses on it, we were in front of the district judge, and I understand the government's now confronted with a new set of facts, and we say, we're just not really sure how to handle this. But we all agree that some due process right should be available. And the judge says, gee, until you can tell me how it's set up, I'm going to set up a system. You can always come back to me later and tell me you've got a better one. Why was that an abuse of discretion? I mean, Your Honor, the judge, you know, imposed pretty rigorous, minimal procedures. And I think the heart of those – the heart of the critical points, so far as the things that the current process satisfied, if I could emphasize maybe just two or three kind of central issues with those procedures, are that they don't – in weighing the liberty interest, in weighing the importance of going through kind of the suitability process, in going through the government's interest and the due interest of the children, I don't think the district court adequately accounted for the very significant interests that HHS has in assuring the safety of the child and making sure that when they release a child from his custody, that it is indeed still to a suitable sponsor. It didn't consider some of the — Sotomayor, the difficulty with that in this case is you've taken them from a suitable sponsor. I'm not sure why the Act requires that you go through the entire mechanism again to find a suitable sponsor if the previous one is willing to take them back. It may not – it may not just be the sponsor itself, Your Honor, but circumstances could change sort of with the sponsor, kind of like where the sponsor lives, who the sponsor is living with, is the sponsor living, or has the sponsor started, you know, having a relationship with a dangerous person. Let me pose Judge Hawkins' question in a little bit different way. We all agree they're entitled to a hearing. You think it's too quick and too burdensome. What's the alternative that you think the law requires? I would say let the existing system work under Flores and under the TVPRA. Minors in the circumstances here will be able to contest the finding of dangerousness that could have led to their redetention. So there's no argument – the government does not argue that there's an ability, there should be an ability to contest the determination in the facts of this case that there's gang affiliation sort of thing, right? They should be able to challenge – we recognize they can challenge dangerousness, Your Honor. Before a neutral magistrate? Before a neutral decision-maker, the IJ in this case. Yes, and that's the IJ, and you agree that the IJ is fine for that purpose? The IJ is fine, yeah. That's the existing scheme. We don't contest that here, Your Honor. So if the district judge in this case in the preliminary injunction had simply said within a reasonable time, would the government have a problem with that? I think we would have had a much better situation, Your Honor, if we said within a reasonable time and consistent with HHS's obligations under the TVPRA to safeguard the suitability and safety of children. That would have been a big boost to, you know, afford. I would still push back. It wouldn't fully address the government's concerns here, Your Honor, because, as Your Honors know, and I want to make sure to save a little bit of time for rebuttal, the constitutional nature of the ruling puts the government in a bind as to – and some of the burdens haven't been able to hit an argument yet, but they're hit on in our brief about just the difficulties of ICE custody, HHS custody, the burdens those provide. Stewart, you do not object to Judge Chabria's notion that you have the burden of showing changed circumstances from the first hearing? No. We do object to that, Your Honor. Why do you object to that? It's not something that applies here. It's something that is supplanted for kind of the general context of adult. Well, why? There's a statutory directive to keep the child in a minor – they may not be childs – the unaccompanied minor in the least restrictive environment. Do you agree? Yes, Your Honor. And the government itself has made a determination that a particular unaccompanied minor – that the act is served by putting an unaccompanied minor not in detention but in a foster home. And now you're saying circumstances have changed. We've now discovered that the child is dangerous or the minor is dangerous. Why shouldn't you have the burden of establishing that? I think the framework is a little different, if I may answer, Your Honor, under the context of the TVPRA, Your Honor, which is specific and geared towards the protection of minors, and it kind of errs on the side of minor safety and welfare. And I think once you end up in that system in the Flores TVPRA regime, it's right to stick to that regime where, yes, you know, a minor can contest dangerousness, but ultimately there's a lesser liberty interest, there's a high custody interest and all that. Oh, sure. No, I'm not saying – I'm not arguing about the nature of the procedure in front of a judge. I'm just saying – or an immigration judge. So the way you envision the hearing in front of the immigration judge is you come in and say, we've determined this child is dangerous, this unaccompanied minor is dangerous. That's – it's his burden to show that he's not. Is that the way you think it works? And I think they have an opportunity, yeah, under the current regime to rebut that finding, Your Honor. But you don't have any obligation to put out any evidence that he is dangerous. It's his burden to show he's not. I believe that's right, Your Honor, but I'll sharpen any fine points, if I may. We'll give you a couple of minutes for rebuttal. Thank you, Your Honor. Thank you. Good morning, Your Honors. Julia Mast for the plaintiffs. I wanted to address the Court's questions regarding the timeline to begin. The 7 to 14 days timeline is in the record at the record excerpts 109. This was actually a statement made by counsel for the government that that is the amount of time that is typically used for a hearing to show changed circumstances in an adult detention context, and that's the timeframe that the district court here based the injunction on because it was what the government represented was the normal course of events for the government. On that precise point, at the hearing before the district court, did the government say that's too constricted a period of time, we cannot meet that? No, Your Honor. Go ahead. But with respect to the amount of time, Judge Baez, I believe, or I can't remember, sorry, whose question it was originally, the amount of time it takes to get in front of a FLORES hearing. The record in this case showed that the three named plaintiffs were in custody for over five months, and one of the named plaintiffs, F.E., who requested a hearing waited three months for his hearing, and this is in the record. So when they got hearings, were they FLORES hearings or were they changed circumstances hearings, or is there any difference between the two? As it turned out, the FLORES hearing that F.E. requested in August of 2017, he actually received just days after the preliminary injunction issued in this case, and so the FLORES hearing was conducted as a FLORES hearing but resulted in his release, because the finding of no changed circumstances with respect to safety or flight risk was relevant to both the FLORES hearing and the Saravia hearing outcome. At that hearing, whose burden was it? At that hearing, it was the — in the FLORES hearings, and I think the way it's been the — it's the minor's burden to show that he or she is not a flight risk or danger. But in the Saravia hearings, the district court's injunction makes clear that it's the government's sort of burden of production to bring forward evidence upon which they're claiming a changed circumstance with respect to safety, safety risk or flight risk. Well, isn't that a substantial difference between the Saravia hearing and the FLORES hearing? Yes. I mean, there are differences. What's the basis for that difference? What is the statutory basis? The main difference — so the main difference is the outcome. The outcome of a Saravia hearing is that the child is released to his or her previously identified and previously vet and approved sponsor. That's the main difference. The questions that — I don't think you understood my question. I'll try it again. We know what the basis for a FLORES hearing is because of FLORES settlement, right? What is the statutory or regulatory basis for a Saravia hearing which shifts the burden of proof from the child in the FLORES hearing to show no dangerousness, no flight risk, to the government to show changed circumstances? Well, the Saravia hearing was ordered by the district court. I know it was ordered. Let me try again. Yes. What was the basis of law which the district court used to concoct the Saravia test? Pardon me for the use of the word concoct. Create. Create. The Fifth Amendment to the Constitution, Your Honor. It's the Due Process Clause of the Fifth Amendment. Let's just go back because I'm still interested and I'm not sure you've answered the question. Let's assume that the government was functioning in an appropriate manner and there was a changed circumstances hearing within seven days after the redetention of one of your clients, okay, in front of an immigration judge. Would it be the burden of your client at that changed circumstances hearing to show that his circumstances hadn't changed or would it be the burden of the government to show that his circumstances changed? Put aside the Saravia order. Assume there's no Saravia order, that this is functioning within the immigration system. Who's burden? Okay. It's the — it remains the burden of the Respondent, which is the — which is the immigrant. Your client. Yes. My client. To show that there's not a safety or flight risk. But under matter of Suge, which is the BIA precedent that the — or the counsel for the government referenced in explaining how it works in the adult context, under that precedent, and — or our counsel stated this several times in the — in the record below, it's the government's job to show how circumstances have changed. And if circumstances haven't changed — Well, see, that's what I'm asking. So is it — is it the job of the government to come in and show changed circumstances? Yes. Or is it the job of the immigrant, the alien, to show that my circumstances haven't changed? It is the government — it's the job of the government — Absent the Saravia decree. So let's assume that we're not operating in a Saravia decree area. Yes. And let's assume that an — that you're brought promptly in front of an immigration judge after redetention. And the judge says, why are you here? And the government says, we redetained him because we — we redetained him. And then the judge says, let's proceed. Is it the government's burden to say, we redetained him because we think he's an MS-13 member? Or is it the guy's — is it the alien's burden to say, I'm — I'm not a dangerous person? That's a pretty straightforward question. In the absence of the Saravia decree, what happens? What happens under a matter of SUGE, which is the BIA precedent that the — For adults. For adults. What happens is that it's the — it's the government's needs to come in and show the changed circumstances that justify a change from the previous bond amount — Which the government's already made a determination. That's correct. Now, in — under the Flores settlement, which I'm not sure how it applies in this case, when you show up at a Flores hearing, whose burden is it to show absence of dangerousness? I think it's unclear in the — in the Ninth Circuit decision that the — the burden discussion isn't entirely clear. Is it clear under the district court's consent decree? This is a good question. In other words, one of the questions I think we're focusing on here is, even if your clients are entitled to a prompt hearing, is it a hearing at which the government has the burden of proof or they have the burden of proof? And why, if the government does not have the burden of proof on the initial hearing, why does it change to the second hearing? You know, the district court was pretty — the district court in our case, in the Saravia case, did not say — the injunction does not require the child — does not require the government to carry the burden of proof in terms of dangerousness or flight risk. Does it — I assume it requires some notice of why they consider the person dangerous. That's correct. It requires notice. If the government can simply come to the hearing and say, we believe you're an MS-13 member, the burden may then be on the defendant — defendant, the — the — The child. The child, the minor. Some of them are not children, to show that I'm not. To rebut the evidence. That's right, Your Honor. So the way it's spelled out in the — in the original preliminary injunction order and in the subsequent orders — there were a number of subsequent orders that kind of clarify the procedure further — the district court makes clear that it's the government's burden to bring the initial evidence and to present the initial evidence of what — what circumstances have changed to justify holding the child in custody. And then the — and then the immigration judge can either find that that evidence isn't sufficient to show a changed circumstance with respect to safety or flight risk, or the child can rebut — can attempt to rebut that evidence. Let's talk back to the first question. Is that the way things would have worked in the absence of this decree? I mean, I know that your answer is they weren't doing anything in the absence of this decree, but if they were following the law in the absence of this decree, is that the way things would have worked? You know, Your Honor, it's really — it's contested, the way things work. It's simply unclear what is the correct process. Is there a statutory directive on this issue anywhere? The floor is hearing. That's not statutory. It's not statutory. That's right. There is no statutory directive to have a hearing. Okay. So I want to go back because I'm not sure. When I read the government's briefing, what the government really says is that the court abused its discretion in issuing a preliminary injunction because your clients didn't have a probability of success on the merits. Shouldn't we leave — if there's tinkering to be done with the process, is that really an issue for us on appeal? In other words, I think the government really said no injunction should have been issued at all because you didn't have a probability of success on the merits. I'm not sure that we're — maybe I want your view on it. Are we here to deal with the details of the injunction or whether or not it should have been issued in the first place? I think you are here to deal with the question of whether it should have been issued here in the first place, and it clearly should have. With respect to the tinkering, I'll just — Because a lot of this is not — the reason we're asking these questions is a lot of this is not the subject of briefing. In other words, nobody says, well, the judge was perfectly okay to issue the injunction, but it should have said 13 days, or it should have said, here's how the procedure works. I read the government's argument to be the judge here in granting an injunction. That's how I read the government's argument as well. And the government hasn't raised any concern about the burden of proof at the hearing. The government's raised concern about the logistics and about — about the release being the remedy in the hearing. How big is the class? Well, the class as of now, I think we only have about — we've had about 34, 35 people identified as class members. Is the thing that — the distinction that involves the class, whether it's 30 or 1,000 is that previous to the government's contention about gang membership or whatever, there had been a determination made that it was okay to put them in foster homes, to use a generality. Yes, that's one of the defining aspects of the class, is there are children who came to the United States seeking protection as unaccompanied minors, were in federal custody, and then through the process that's outlined in the TVPRA — There was a determination made that it's okay to — for noncustodial, if you will, taking care of. Correct, Your Honor, that they didn't pose a flight risk or a danger of flight or a danger to the community, and they were released to sponsors who were approved by ORR. And at the start of that process that led to this noncustodial determination, whose burden was it? I'm sorry, at the start of the process within the TVPRA? Yeah, somebody — they show up at the border, and they're claiming asylum, and they're unaccompanied, and flora supplies or whatever. At some point, a determination — through HHS, a determination is made that noncustodial is okay. Right. Well, it's the government's obligation to place, under the TVPRA and under the Flores Agreement, to place children in the least restrictive — So there's not a hearing at the front end? There's not a hearing. The government looks at the minors and says, we think you're suitable for placement. There's a process. There's a process. There's not a hearing. So at the beginning of the process, if the government had said to a minor, we don't think you're suitable for placement in a nonrestrictive environment, a foster home, because we think you're a danger or a flight risk, how would the minor attack that? Not the rearrest, right? The very beginning of a process. Well, the minor at that point would have access to a Flores hearing, where he or she could which would result at most in, if the immigration judge agreed that the child didn't pose a danger, then that would result in the child being stepped down to a more shelter environment. With the burden of proof on the child. That's — well, I think it's — the truth is, Your Honor, it's unclear and contested within the Flores — between the parties in the Flores litigation how that burden is supposed to shift out. Yeah. When we deal with bond revocation, the government says it's our burden to come in and show — change circumstances. I'm reading from the transcript. That's what the transcript indicates. Yes, that was the government's position. All right, all right. Marie 107, but it's — you're saying it's just not clear either from the statutes or any court order on whom the burden falls in this circumstance in the absence of the judge's preliminary injunction? In the circumstance — if we're talking about the Flores circumstance, I think there's a lack of clarity. I think with the Saravia hearings, Judge Chabria has been — No, no, I'm trying to ask — we're focusing on the Saravia hearings. I'm trying to ask if you didn't have to bring this case because these children were getting prompt hearings in front of an immigration judge about their circumstances, and they were showing up at that hearing, how would the hearing work? Would the government say, we think they're dangerous, they have to prove they're not? Or would the government say, we think they're dangerous and here's a showing? Or would the government simply say, here are our charges, you rebut them? That's what we're trying to figure out. Well, if we didn't have this case, we wouldn't have the hearing. And we certainly wouldn't have — Well, no, you would have a hearing. You wouldn't have a prompt hearing. In other words, that's the difficulty with this case. You'd show up in front of — your clients would be entitled at some point, perhaps very late in the process, to show up in front of an immigration judge and say, my circumstances, you know, I've been put into — now, Judge Saravia says, probably correctly, that was — that's — no one — you should get that at least as quickly as an adult does. And so I'm going to give it to you at least as quickly as an adult does. And then he says, and this is the way the hearing's going to work. And all we're trying to figure out is, if they'd gotten — if they were — if they'd gotten it through the normal process as quickly as judge — as the district judge ordered it, how would the hearing have worked? I think the hearing — the government certainly takes the position that the burden is on the child to prove safety or flight risk. And the — one of the reasons it's very different for this class is that these children have already been released. Why is that different? Why is the burden of proof different the second time than it is the first time? What statutory or regulatory or case decision says that once they made a decision, there is a requirement for changed circumstances? I didn't see that in Judge Chabria's opinion. The reason it has to be different, Your Honor, is that having made a — Vested right in the child once he's been found to be in the least restrictive environment, therefore you've got — you have a certain burden of proof on the government to change the status quo. Is there — when we're talking about liberty interest, is it part of the liberty interest how well he's being treated, but now he's losing it? The reason that it makes — the reason that it's required, it's drawn from both the matter-of-suge case out of the BIA — Which deals with adults. Which deals with adults, and revocation of bail jurisprudence in the criminal context also. If a person's released on bail, they can't be picked up just for the same reason based on the same arrest warrant. Again, that violates the Fourth Amendment. You have to have — You've been through some of these hearings. Tell us how they work now. That was going to be my question. Would you like to know how they work? What happens in a Saravia hearing? In the Saravia hearings that I attended, Your Honor, the government came forward, presented memos. In some of them, I think there was testimony presented. In the ones that I attended, there wasn't testimony presented, but there was a lot of argument. And the child may or may not testify, depending on how the immigration judge decides to rule on that question. But based on the sort of documentary evidence that was presented, really kind of counsel argued over whether — What I'm asking is, maybe the burden of proof is something that lawyers worry about in this context, but which may not be terribly important. I mean, the government obviously comes in and has to give notice of why it — We did this because we have a police report. We did this because somebody told us — You know, we have — And then the child says something, and the judge hears stuff and decides what it is. I'm trying to figure out whether the burden — Do cases ever get dismissed because nobody's made it their burden of proof, or do both sides just show up and put in their evidence? I think the most important point about the way these hearings played out is that as of December 22nd, which is when the government provided the results of the hearings to the district court, out of the 29 hearings that had been conducted, and there — I don't know that the immigration court had a lot of clarity about this burden conducted, 26 children who had been in custody at that point for months — Were released. Were released. Because the government had not brought evidence of changed circumstances related to safety or flight risk that was sufficient for the immigration judge to continue to maintain those children in custody. And that's why this preliminary injunction is so important to maintain in place. And these can — You've indicated that maybe burden of proof didn't appear that important at the hearing. Is it sufficient for the purposes of the class that you represent that there be notice and an opportunity to be heard? Well, notice and an opportunity to be heard can be played out in many ways. I think notice of the actual allegations and the facts and an opportunity to be heard in front of a neutral decision-maker like an immigration judge with the opportunity to cross-examine witnesses and to rely on reliable evidence, yes. I take it in some of these cases the government came in and said, we think they're a gang member, and the immigration judge listened to the evidence and said, that's not enough. That's correct, Your Honor. It didn't require a word from the respondent. That's correct, Your Honor, because often they relied on memos that were drafted, maybe unsigned memos that were drafted by an agent of the Homeland Security. I've taken you way over your time, and our presiding judge has been very patient. Oh, I have. Thank you, Your Honor. Thank you all. Mr. Stewart, we gave you two minutes. Thank you, Your Honor. I'd emphasize, Your Honor, on the burden point. In the absence of the preliminary injunction here, I believe the burden would be on the alien. Well, where do you get that from? I mean, what I read in the record is with respect to adults who have been out on bond and bond has been revoked, the government agrees that it's their burden to change circumstances. That's ICE needs to make a showing that there are changed circumstances, RE107. Why is it different with children? My understanding, Your Honor, is you're saying we should stick with the normal change circumstances process, and the judge, I think, essentially did. He said, you say a hearing occurs within 7 to 14 days, I'll order that. You say the government has the burden of showing changed circumstances, I'll order that. So I'm ordering that you use the changed circumstances process for minors the same way you do for adults whose bond is revoked. So tell me where in the statutes the minor's situation is different. Your Honor, I believe the way the burden doesn't change for the rearresting of adults context. Basically, somebody has to prove that they're not a danger, and if the reality is that there's been no changed circumstances, my understanding is that they then are released because there's no basis to hold them. So I don't think the burden changes, even though it kind of comes there in that quirky way. So what's your quarrel, then, with this process? That here, consistent with Flores, the Flores agreement and the rest of the legal regime here, that a minor should need to show a lack of present dangerousness in order to be eligible for release. But the minor has shown it, albeit some earlier time in the you've made a determination in an earlier time that there was a lack of dangerousness. Previously, Your Honor, but as I mentioned earlier, sometimes, you know, years past. So circumstances change. And so the question is, who has the obligation of showing those changed circumstances? And you're saying the minor has the obligation of showing that circumstances haven't changed? Showing lack of present dangerousness. So how does the hearing work, then? You come in and you don't have to put on any evidence at all? The minor just has to show up at the hearing and show a lack of present dangerousness? I mean, I think the hearing, the non-suravia hearing, a changed circumstances hearing under the immigration law. I think, you know, truncated, that's, you know, that seems right, Your Honor. Government doesn't have to say we think you're dangerous or we have some evidence that you're dangerous. He has a continuing obligation to show up at hearings when re-arrested and show the absence of dangerousness. Well, I think these hearings will sometimes be adjourned for the consideration of additional evidence and, you know, the immigration judge can make sure that, you know, they're satisfied that things are in order. I see that I'm well over. I have one question. My note here may be incorrect, but I heard the government concede that at the second hearing that it is the burden of someone to show changed circumstances. Is that correct? Yes or no? No. I didn't. I certainly said I should say it's not on the government yet, not on the government to show changed circumstances. No, but it's a burden of someone. In other words, there's a hearing about whether circumstances have changed. In the adult context, yes. Well, but what you're saying, one reason you quarrel with the — now I'm confused. One reason you quarrel with the preliminary injunction is you say existing processes are fine. At that existing process, assuming you've done precisely what you did here, under the existing process somebody shows up in front of an immigration judge at some point. Who has to show changed circumstances at that point, the government or the minor? It may not be clear. I can't find it anywhere in the statutes. I'm just asking. Right. I think I've done my best to articulate that, you know, it's a showing of a lack of present dangerousness and — Yeah, and so it's — But it's not changed circumstances. What you're saying is the same desiderata applies at the first hearing than it does at the second hearing. There's no necessity to show changed circumstances in the first hearing. Right. There's no necessity to show changed circumstances at the second hearing. The burden is still on the child to show that there's no flight risk and no present danger. So what really happens — There's no race judicata effect. What really happens at one of these hearings? There's a child who previously had been determined through the agency process to be suitable for noncustodial supervision, placement with a family or whatever. Okay? And the government decides or receives evidence that leads them to believe that the person has engaged in either criminal behavior or gang affiliation or whatever. How do you bring that to the attention of the immigration court? Do you serve a notice on the person? I can't pinpoint at this moment just some into mind the exact mechanism, but we do — I believe we've described that there is some notice given and then a presentation. And there's a hearing before an immigration judge, and the immigration judge comes out on the bench, and she says, Why are we here? And you say, Ask the minor. No, I think we — You say something. You say we're here because — We have concerns and, you know, now, you know, like, present the lack — you know, I believe that's right. If I've misstated something, I'll correct that. I want to be careful if some of that wasn't in the record, Your Honor. Thank you, Your Honor. Can I ask one more question? Sure. This is a question I ask your colleague. I've read your briefs, and your briefs don't say the judge should have granted an injunction, but it should have read differently. It should have said 30 days, not seven or whatever. Is that — am I correct reading your brief is what you're saying is the judge abused his discretion in entering an injunction because these — the class was not — did not have a probability of success in the merits? That's what I read your brief to say. Am I — do I misread it? You're right. There shouldn't be — shouldn't have been any injunction, Your Honor. Okay. Fair enough. Thank you, Your Honor. Thank you very much, and thank you both for a very elucidating argument. And the case of Sarabi v. Sessions is submitted, and we are adjourned for the day. Okay. All rise.
judges: Hawkins, Bea, Hurwitz